## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In Re:

**HAROLD S. ALBERTSON, JR.,**                    **Case No. 2:13-bk-20455**
                                                 **Chapter 7**
          **Debtor.**

_____

**ARTHUR M. STANDISH as Trustee,**

          **Plaintiff,**

v.                                               **AP No. 15-**

**P. RODNEY JACKSON; LAC, LLC, a**
**West Virginia limited liability company; and**
**LAC HOLDINGS, LLC, a South Carolina**
**limited liability company,**

          **Defendants.**
                              **COMPLAINT**

For his Complaint, Plaintiff, Arthur M. Standish, as Trustee, states as follows:

1.    On September 5, 2013, Petitioning Creditors Amity Real Estate, Ltd., Arman Ray

Lewis, and Harold Ray Moles, Jr. filed an Involuntary Petition for Chapter 7 Bankruptcy against

Harold S. Albertson, Jr. with the United States Bankruptcy Court for the Southern District of

West Virginia.  [Doc. 1]

2.    The Debtor did not protest the involuntary petition and an Order for Relief was

entered November 5, 2013.  [Doc. 15]

3.    Arthur M. Standish was added as Trustee on September 9, 2013.

4.    Accompanying Involuntary Petition was a statement which, in part, read as

follows:  "Upon information and belief, Mr. Albertson did, in fact, reach a settlement on behalf of

the infant child as a result of a court approved settlement which provided for reimbursement of attorney fees and costs to attorneys.  Upon information and belief, another attorney, Mr. P. Rodney Jackson may have been involved in the litigation in some manner."  [Doc. 1-1 at 1]

5.    On November 6, 2011, an accident occurred at a Cabell County cemetery involving Lydia P., a 23-month-old toddler, when her brother lost his balance and fell on a tombstone knocking it onto Lydia P., who suffered catastrophic injuries as a result.

6.    Debtor, Harold S. Albertson, Jr., was retained as counsel to represent Lydia P. through her mother and next friend as a result of the accident.

7.    A "Contingent Fee Contract" was executed by Lydia P.'s mother and next friend providing, "The undersigned parties hereby agree that Harold Albertson, Attorney At Law . . . is retained to represent Lydia . . . P . . . in the claim against the responsible persons or corporations relating to recent injuries for a contingent fee of 40% of any recovery."

8.    Defendant, P. Rodney Jackson, is a West Virginia licensed attorney.

9.    Defendant, LAC, LLC, is a West Virginia limited liability company, solely owned and managed by Defendant, P. Rodney Jackson.

10.    Defendant LAC, LLC, a West Virginia limited liability company, managed by Defendant P. Rodney Jackson, merged into LAC Holdings, LLC, a South Carolina limited liability company, on or about February 15, 2013.

11.    On July 21, 2012, a suit was filed in the Circuit Court of Wyoming County styled Kristin . . . V . . . , individually and as Mother and next-friend of Lydia . . . P . . . v. Stonemor GP, LLC, et al., Wyoming County Civil Action No. 12-C-148.

12.    Plaintiff's attorneys in that suit were Mr. Albertson and Mr. Jackson.

13.      A notice of dismissal of that suit was filed on September 17, 2012.

14.      Following the retention of Mr. Albertson by Lydia P.'s mother and next friend, Mr. Albertson and LAC entered into a number of written agreements wherein Mr. Albertson was identified as "Seller" and LAC was identified as "Buyer" relative to Mr. Albertson's representation of Lydia P.

15.      Upon information and belief, neither Mr. Albertson nor Mr. Jackson provided notice to nor obtained consent from their clients regarding any of these written agreements.

16.      On February 27, 2013, Mr. Albertson and LAC entered into an agreement whereby Mr. Albertson transferred "to LAC a $83,000 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in a case the agreement identifies as "Lydia [P.], an infant, et als v Stonemor Partners, LP, a Delaware Limited Partnership et als in a claim arising out of an accident that occurred on November 6, 2011."

17.      In exchange for the payment of $83,000 by LAC to Mr. Albertson, Mr. Albertson agreed to pay "interest" to LAC pursuant to the following terms:

**DISCLOSURE TABLE**

| Date of Payment to LAC, LLC | Number of Months | Amount of LAC, LLC's Interest/Amount Due to LAC, LLC |
|---|---|---|
| On or Before February 26, 2013 | 12 | $182,600 |
| After February 27, 2013 on or before February 26, 2014 | 24 | 401,720 |
| After February 27, 2014 and on or before February 26, 2015 | 36 | 883,784 |

18.      Although, on the one hand, the agreement makes it appear to be non-recourse, it contains other language giving the Buyer recourse under a number of different circumstances:

2. <u>Contingency Agreement</u>

If no recovery of Attorney's Fee is received under such Claim as a result of a verdict, judgment, award, or settlement, Seller shall have no responsibility, obligation or duty to pay Buyer the Purchase Price, unless Seller's failure to recover Proceeds arises from or in connection with any fraud, misrepresentation, deception, breach of warranty or failure to perform any covenant contained in this Agreement by Seller, who will then be liable for Buyer's attorney's fees or collection costs, as permitted by law.

19.    Although Mr. Jackson is the principal and manager of LAC and, at least for a

period of time served as co-counsel with Mr. Albertson, the agreement states:

**Buyer's Acknowledgement.**  Purchaser acknowledges and agrees that Purchaser shall have no right to and will not make any decisions with respect to the conduct of the Legal Claim or any settlement or resolution thereof.

20.    The purpose of the loan from LAC and/or Mr. Jackson to Mr. Albertson is stated

in the agreement as follows:

(f)    Seller is using the funds received from the Purchase price for Seller's immediate economic necessities. Seller has been advised that Seller should not sell any portion of the Proceeds of the Claim if Seller has any other alternative to meet Seller's immediate economic necessities. Because buyer is taking a high risk in purchasing the portion of the Proceeds of the Claim, Seller understands buyer may make a large profit. Seller acknowledges that seller has been advised to seek the services of tax, accounting and financial advisors (in addition to my attorney) in the negotiating and signing of this Agreement. Seller has valid reasons for selling to Buyer an Interest in the Proceeds rather than waiting until there is a verdict, aware or settlement of the Claim. Seller understands that the amount of Buyer's Interest as set forth in the Disclosure table is greater than the Purchase price Seller is receiving, and there is a cost to Seller of selling to Buyer the Interest.

21.    With respect to the mechanics of repayment, the agreement provides:

(a)    Buyers interest shall be paid from the Proceeds of the Claim and will be ducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller. Co-counsel in the claim, P. Rodney Jackson, shall handle and disburse all monies received from such claim. If the Proceeds of the Claim are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim.

22.    The agreement further provides:

> (c)    The amount due Buyer shall be withheld from any money collected as a result of Seller receiving Proceeds of the Claim and Proceeds shall immediately be paid to Buyer (after first deducting other Attorney's fees and costs, and any prior liens which exist on the date of this Agreement). Seller agrees that all Proceeds received in connection with this Claim shall be held in trust for Buyer by P. Rodney Jackson until Buyer has been fully paid the amount due under this Agreement Seller agrees that Seller will not receive any money or payment from the Proceeds of the Claim until Buyer has been paid its interest in full.

23.    Although the agreement references the payment of "interest" on the $83,000

paid by LAC to Mr. Albertson, the agreement further states:

> (i)    **Treatment of Transaction.**  Seller agrees to treat and report the sale and purchase of the Purchased Interest as a sale transaction and not as a loan for all purposes (including tax purposes).

24.    With respect bankruptcy, the agreement states:

> (j)    **Treatment in Bankruptcy.**  If Seller commences or has commenced against it any case or other proceeding pursuant to any bankruptcy, insolvency or similar law prior to payment of the full LAC, LLC interest/payment to Buyer, Seller shall cause the Purchased Interest to be described as an asset of Purchaser (and not as a debt obligation of Seller) in any oral or written communications, including, without limitation, any schedule or other document filed in connection with such case or proceeding.

25.    The agreement also has a "Reclassification" provision which states:

> This Agreement represents an investment by Buyer, and not a loan to Seller. However, should a court of law determine that the transaction set out in this Agreement is a loan of money Seller agrees that interest shall accrue at the maximum rate permitted by law. Seller agrees that any fees or expenses paid by Buyer in connection with the Claim will not be included as interest. This includes the Administrative fee described by paragraph 1 above, and any attorney's fees and/or costs Buyer has expended to enforce its rights under this Agreement. Seller agrees that these will be considered as reimbursements to Buyer, rather than as interest.

26.    Attached to this agreement was an "Exhibit 'A'" which stated in part:

Pursuant to that certain Purchase Agreement February 27, 2013 between Harold Albertson and LAC, LLC (the "Agreement") I, Harold Albertson hereby irrevocably authorize and direct P. Rodney Jackson, co-counsel in the Lydia P    case, to, among other things (i) acknowledge an assignment, consensual lien and security interest in favor of LAC against any and all of the proceeds due me from the Claim (after payment of any and all legal fees, reimbursable costs, statutory liens and liens buyer has been advised of that are in existence prior to the date of the Agreement) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of LAC, LLC interest, (ii) pay LAC, LLC from the Proceeds the amount due to Buyer representing its interest in the Proceeds of my Claim at the time of distribution of the proceeds prior to any payment to me with respect to my Claim, (iii) notify LAC, LLC of any verdict, Award, settlement, discontinuance or ending with respect to my Claim, (iv) respond to request for information from LAC, LLC and (v) call or contact LAC, LLC prior to any disbursement of funds to verify the amount due prior to any distribution of Proceeds to Seller. (v) pay all sums of money from the Proceeds due and owing by Seller to P. Rodney Jackson, individually, as evidenced by prior written agreements between Seller and P. Rodney Jackson.  Such sums shall include evidences by P. Rodney Jackson to Harold Albertson of $233,000, which shall be paid back without interest.  The remaining sums shall be paid back in accordance with the following Exhibits C-F.

The amount of LAC, LLC interest will increase to reflect the date LAC, LLC is paid its Interest and Proceeds set forth in the Disclosure table attached to the Agreement as Exhibit B, as such may be amended from time to time. This authorization is irrevocable and binding and may only be amended by the mutual written agreement of LAC, LLC and Seller.

_2-27-13_    _Harold Albertson_
Date    Harold Albertson

27.    Attached to Exhibit A to the agreement were various previous agreements whereby LAC loaned money to Mr. Albertson in exchange for agreements to assign a portion of the proceeds of any judgment or settlement in the Lydia P. litigation to LAC and/or repay those loans in accordance with an interest schedule appearing in each agreement.

28.    On October 1, 2012, Mr. Albertson and LAC entered into an agreement whereby Mr. Albertson sold "to LAC a $4,000 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in a case the agreement identifies as "Lydia [P.], an infant, et als v Stonemor Partners, LP, a Delaware Limited Partnership et als in a claim arising out of an accident that occurred on November 6, 2011."

29.     In exchange for the payment of $4,000 by LAC to Mr. Albertson, Mr. Albertson agreed to pay "interest" to LAC pursuant to the following terms:

**DISCLOSURE TABLE**

| Date of Payment to LAC, LLC | Number of Months | Amount of LAC, LLC's Interest/Amount Due to LAC, LLC |
|---|---|---|
| On or Before September 30, 2012 | 12 | $ 8,800 |
| After October 1, 2012 on or before September 30, 2013 | 24 | 19,360 |
| After October 1, 2013 and on or before September 30, 2014 | 36 | 42,592 |

30.     On October 31, 2012, Mr. Albertson and LAC entered into a similar agreement whereby Mr. Albertson sold "to LAC a $10,500 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in a case the agreement identifies as "Lydia [P.], an infant, et als v Stonemor Partners, LP, a Delaware Limited Partnership et als in a claim arising out of an accident that occurred on November 6, 2011."

31.     In exchange for the payment of $10,500 by LAC to Mr. Albertson, Mr. Albertson agreed to pay "interest" to LAC pursuant to the following terms:

**DISCLOSURE TABLE**

| Date of Payment to LAC, LLC | Number of Months | Amount of LAC, LLC's Interest/Amount Due to LAC, LLC |
|---|---|---|
| On or Before October 30, 2012 | 12 | $ 23,100 |
| After October 31, 2012 on or before October 30, 2013 | 24 | 58,820 |
| After October 31, 2013 and on or before October, 2014 | 36 | 111,804 |

32.     On November 7, 2012, Mr. Albertson and LAC entered into a similar agreement whereby Mr. Albertson sold "to LAC a $100,000 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in a case the agreement identifies as "Lydia [P.], an infant, et als v Stonemor Partners, LP, a Delaware Limited Partnership et als in a claim arising out of an accident that occurred on November 6, 2011."

33.     In exchange for the payment of $100,000 by LAC to Mr. Albertson, Mr. Albertson agreed to pay "interest" to LAC pursuant to the following terms:

**DISCLOSURE TABLE**

| Date of Payment to LAC, LLC | Number of Months | Amount of LAC, LLC's Interest/Amount Due to LAC, LLC |
| --- | --- | --- |
| On or Before November 7, 2013 | 12 | $220,000 |
| After November 7, 2013 on or before November 6, 2014 | 24 | 484,000 |
| After November 7, 2014 and on or before November 6, 2015 | 36 | 582,800 |

34.     On December 18, 2012, Mr. Albertson and LAC entered into a similar agreement whereby Mr. Albertson sold "to LAC a $35,000 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in a case the agreement identifies as "Lydia [P.], an infant, et als v Stonemor Partners, LP, a Delaware Limited Partnership et als in a claim arising out of an accident that occurred on November 6, 2011."

35.     In exchange for the payment of $35,000 by LAC to Mr. Albertson, Mr. Albertson agreed to pay "interest" to LAC pursuant to the following terms:

**DISCLOSURE TABLE**

| Date of Payment to LAC, LLC | Number of Months | Amount of LAC, LLC's Interest/Amount Due to LAC, LLC |
|---|---|---|
| On or Before December 17, 2013 | 12 | $77,000 |
| After December 18, 2013 on or before December 17, 2014 | 24 | 169,400 |
| After December 18, 2014 and on or before December 17, 2015 | 36 | 372,680 |

36.     In addition to the agreements attached to Exhibit A to the agreement between Mr. Albertson and LAC executed on February 27, 2013, identified therein as Exhibits A through F, Mr. Albertson executed an agreement dated April 18, 2013, appending additional Exhibits G and H to the February 27, 2013, agreement.

37.     On April 17, 2013, and designated as Exhibit H, Mr. Albertson and LAC entered into a similar agreement whereby Mr. Albertson sold "to LAC a $15,000 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in a case the agreement identifies as "Lydia [P.], an infant, et als v Stonemor Partners, LP, a Delaware Limited Partnership et als in a claim arising out of an accident that occurred on November 6, 2011."

38.     In exchange for the payment of $15,000 by LAC to Mr. Albertson, Mr. Albertson agreed to pay "interest" to LAC pursuant to the following terms:

**DISCLOSURE TABLE**

| Date of Payment to LAC, LLC | Number of Days | Amount of LAC, LLC's Interest/Amount Due to LAC, LLC |
|---|---|---|
| On or Before July 17, 2013 | 90 | $15,000 |
| After July 17, 2013 | > 90 | 20,000 |

39.     According to the available agreements between Mr. Albertson and LAC, LAC loaned Mr. Albertson the sums of $83,000, $4,000, $10,500, $100,000, $35,000, and $15,000, for a total of $247,500.00.

40.     In addition, Exhibit A to the agreement executed between Mr. Albertson and LAC on February 27, 2013, states as follows: "Pursuant to that certain Purchase Agreement February 27, 2013 between Harold Albertson and LAC, LLC . . . I, Harold Albertson hereby authorize and direct P. Rodney Jackson, co-counsel in the Lydia P . . . case, to . . . pay all sums of money from the Proceeds due and owing by Seller to P. Rodney Jackson, individually, as evidenced by prior written agreements between Seller and P. Rodney Jackson. Such sums shall include evidences by P. Rodney Jackson to Howard Albertson of $233,000, which shall be paid back without interest. The remaining sums shall be paid back in accordance with the following Exhibits C-F."

41.     No written agreements have been located between Mr. Albertson and Mr. Jackson evidencing the payment by Mr. Jackson to Mr. Albertson the sum of $233,000 or the assignment of Mr. Albertson's interest in the settlement proceeds to Mr. Jackson or LAC in said amount.

42.     Indeed, Exhibit "B" to the agreement dated February 27, 2013, provides as follows:

## EXHIBIT "B"

**PRIOR SALES, TRANSFERS, ASSIGNMENTS OR CONVEYANCES OF ANY INTEREST IN THE CLAIM**

List previous liens, if any:

43.     On March 8, 2013, a letter was sent from Johnnie E. Brown, an attorney with the firm of Pullin, Fowler, Flanagan, Brown & Poe, PLLC, to Mr. Jackson stating, "I wish to further confirm that we have resolved this case for the sum of $7.25 million dollars."

44.     On May 3, 2013, Mr. Albertson filed a petition for judicial approval of the infant settlement in the Circuit Court of Kanawha County.

45.     The petition requested judicial approval of the "Payment of $2,850,000 to the attorney for petitioner as attorney fees" and the "Payment of $50,000.00 to attorney for petitioner as reimbursement for expenses incurred in pursuing this claim."

46.     On May 8, 2013, an order was entered by the Honorable Carrie L. Webster, Judge of the Circuit Court of Kanawha County, in a matter styled Lydia . . . P . . ., an infant under the age of eighteen (18) years, by and through her mother and next friend, Kristen . . . V . . ., Civil Action No. 13-P-248, appointing John Bailey as guardian ad litem, and setting a hearing for June 27, 2013, for judicial approval of the proposed settlement.

47.     On July 1, 2013, an order was entered approving the settlement and upon information and belief, the settlement was approved with a proportionate fee of approximately one-third rather than forty percent.

48.     Thereafter, Mr. Jackson provided to Mr. Albertson the following recapitulation of distribution of the settlement proceeds:



$2,466,666

- $ 50,000.   Reimbursed Expenses
--------------
$2,416,666. (⬛⬛⬛⬛⬛⬛⬛⬛)

- 36,000.   Non-Reimbursed Expenses
-----------------
$2,380,666

$1,190,333.   1/2 of fee to you

- $775,500.   Monies owed by you per agreement
--------------------
$414,833.   Net amount of your check. Please see enclosed details
of amounts and dates of cash advances to you.

I enjoyed working this case with you. Any questions, just call

49.     Upon information and belief, Mr. Jackson provided Mr. Albertson with the

following recapitulation of principal and interest calculations for the amounts "loaned":

### Loan Amounts Report - Individual



50.     An Involuntary Petition was filed by Mr. Albertson on September 5, 2013.  [Doc. 1]

51.     The 90-day look back period is June 7, 2013.  11 U.S.C. § 547.

52.     Upon information and belief, as the amended petition for judicial approval of the Lydia P. settlement was filed on June 12, 2012, and judicial approval of the Lydia P. settlement was not entered until July 1, 2013, any payment to Mr. Albertson, Mr. Jackson, or LAC out of the proceeds of the settlement of the Lydia P. litigation would have been within 90 days of Mr. Albertson's Chapter 7 Petition.

53.     According to the "Loan Amounts Report," which upon information and belief was prepared by LAC and/or Mr. Jackson, Mr. Albertson was charged $4,800 in interest on a $4,000 loan made on October 1, 2012, and for which payment would have been made on or after July 1, 2013.

54.     The interest rate on this "loan" from LAC and/or Mr. Jackson to Mr. Albertson referenced in the preceding paragraph would have been over 100 percent annually.

55.     According to the "Loan Amounts Report," which upon information and belief was prepared by LAC and/or Mr. Jackson, Mr. Albertson was charged $23,100 in interest on a $10,500 loan made on October 31, 2012, and for which payment would have been made on or after July 1, 2013.

56.     The interest rate on this "loan" from LAC and/or Mr. Jackson to Mr. Albertson referenced in the preceding paragraph would have been over 100 percent annually.

57.     According to the "Loan Amounts Report," which upon information and belief was prepared by LAC and/or Mr. Jackson, Mr. Albertson was charged $120,000 in interest on a

13

$100,000 loan made on November 7, 2012, and for which payment would have been made on or after July 1, 2013.

58.    The interest rate on this "loan" from LAC and/or Mr. Jackson to Mr. Albertson referenced in the preceding paragraph would have been over 100 percent annually.

59.    According to the "Loan Amounts Report," which upon information and belief was prepared by LAC and/or Mr. Jackson, Mr. Albertson was charged $32,000 in interest on $35,000 in loans made on November 2, 2012, and December 18, 2012, and for which payment would have been made on or after July 1, 2013.

60.    The interest rate on this "loan" from LAC and/or Mr. Jackson to Mr. Albertson referenced in the preceding paragraph would have been over 100 percent annually.

61.    According to the "Loan Amounts Report," which upon information and belief was prepared by LAC and/or Mr. Jackson, Mr. Albertson was charged $99,600 in interest on a $83,000 loan made on February 27, 2013, and for which payment would have been made on or after July 1, 2013.

62.    The interest rate on this "loan" from LAC and/or Mr. Jackson to Mr. Albertson referenced in the preceding paragraph would have been over 100 percent annually.

63.    According to the "Loan Amounts Report," which upon information and belief was prepared by LAC and/or Mr. Jackson, Mr. Albertson was charged $279,000 in interest on payments of $496,500 from LAC and/or Mr. Jackson to Mr. Albertson between October 1, 2013, and May 17, 2013, and for which payment would have been made on or after July 1, 2013.

64.    The interest rate on these "loans" from LAC and/or Mr. Jackson to Mr. Albertson referenced in the preceding paragraph would have been over 100 percent annually.

14

## Count I -- Usury

65.     Plaintiff incorporates the allegations in Paragraphs 1 through 64 by reference.

66.     W. Va. Code § 47-6-5(b) provides, "Parties may contract in writing for the payment of interest for the loan or forbearance of money at a rate not to exceed eight dollars upon one hundred dollars for a year, and proportionately for a greater or less sum, or for a longer or shorter time, including points expressed as a percentage of the loan divided by the number of years of the loan contract."

67.     W. Va. Code § 47-6-7 provides, "All contracts and assurances made directly or indirectly for the loan or forbearance of money or other thing at a greater rate of interest than is permitted by law shall be void as to all interest provided for in any such contract or assurance, and the borrower or debtor may, in addition, recover from the original lender or creditor or other holder not in due course an amount equal to four times all interest agreed to be paid and in any event a minimum of one hundred dollars."

68.     LAC and/or Mr. Jackson contracted with Mr. Albertson for the payment of interest for the loan of money at a rate exceeding eight percent per annum.

69.     Although the agreements between LAC and/or Mr. Jackson and Mr. Albertson attempted to characterize them as being other than loan agreements, the parties to those agreements treated them otherwise, including Mr. Jackson's notations describing them as "loans;" the process as one of "loaning" money to Mr. Albertson; the amounts as "Monies owed by you per agreement;" and the interest in the legal fees that would be received when their case settled as "collateral" for the funds transferred by Mr. Jackson to Mr. Albertson:

15



70.  Likewise, although certain provisions of the agreements between LAC and/or Mr. Jackson and Mr. Albertson referenced contingencies, other provisions of the agreements rendered those contingency provisions, as well as the actual circumstances of the underlying tort action in which the child's injuries were catastrophic; the liability of the corporate defendant clear; and the ability of the claimants to enforce any judgment certain enough, meaningless.

71.  Accordingly, because the agreements between LAC and/or Mr. Jackson and Mr. Albertson were loans with interest provisions in excess of that permitted by law, they are void under W. Va. Code § 47-6-7, and LAC and/or Mr. Jackson are liable to the Debtor's Estate in an amount equal to four times all interest agreed to be paid by Mr. Albertson to LAC and/or Mr. Jackson in violation of W. Va. Code § 47-6-5(b).

WHEREFORE, Plaintiff, Arthur M. Standish, as trustee, demands judgment against Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, in the amount One Million Three Hundred Ninety-Five Thousand $1,395,000 pursuant to W. Va. Code § 47-6-5(b), plus pre- and post-judgment interest.

<u>Count II -- Illegality</u>

72.     Plaintiff incorporates the allegations in Paragraphs 1 through 71 by reference.

73.     At the time of the agreements between LAC and/or Mr. Jackson and Mr. Albertson, R. Prof. Cond. 1.5(e) provided, "A division of a fee between lawyers who are not in the same firm may be made only if:  (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; (2) the client is advised of and does not object to the participation of all of the lawyers involved; and (3) the total fee is reasonable."

74.     At the time of the agreements between LAC and/or Mr. Jackson and Mr. Albertson, R. Prof. Cond. 1.5(e) provided, "The requirements of 'services performed' and 'joint responsibility' shall be satisfied in contingent fee cases when:  (1) a lawyer who is regularly engaged in the full time practice of law evaluates a case and forwards it to another lawyer who is more experienced in the area or field of law being referred; (2) the client is advised that the lawyer who is more experienced in the area or field of law being referred will be primarily responsible for the litigation and that there will be a division of fees; and (3) the total fee charged the client is reasonable and in keeping with what is usually charged for such matters in the community."

75.     At the time of the agreements between LAC and/or Mr. Jackson and Mr. Albertson, R. Prof. Cond. 1.8(a) provided, "A lawyer shall not . . . knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless . . . the transaction and terms on which the lawyer acquires the interest are fair and reasonable and are fully disclosed and transmitted in writing in a manner which can be reasonably understood by the

client . . . the client is given a reasonable opportunity to seek the advice of independent counsel . . . and the client consents in writing thereto."

76.     At the time of the agreements between LAC and/or Mr. Jackson and Mr. Albertson, R. Prof. Cond. 1.8(e) provided, "A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation" with a few specified exceptions.

77.     At the time of the agreements between LAC and/or Mr. Jackson and Mr. Albertson, R. Prof. Cond. 1.8(f) provided, "A lawyer shall not accept compensation for representing a client from one other than the client unless . . . the client consents after consultation . . . there is no interference with the lawyer's independence of professional judgment . . . and . . . information relating to the representation of the client is protected . . . ."

78.     At the time of the agreements between LAC and/or Mr. Jackson and Mr. Albertson, R. Prof. Cond. 1.8(j) provides, "A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:  (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and (2) contract with a client for a reasonable contingent fee in a civil case."

79.     By entering into contracts with Mr. Albertson requiring Mr. Albertson to repay money loaned by LAC and/or Mr. Jackson to Mr. Albertson irrespective of the outcome of the Lydia P. litigation, Mr. Jackson acquired a proprietary interest in the cause of action or subject matter of the litigation at the same time Mr. Jackson was serving as counsel to the plaintiff that was unrelated to "a lien granted by law to secure" Mr. Jackson's "fee or expenses" or a "contract with a client for a reasonable contingent fee in a civil case."

80.    Upon information and belief, Mr. Jackson's clients were not advised in accordance with R. Prof. Cond. 1.5(e), but were only asked to execute the following document:

### ADDENDUM TO CONTINGENT FEE CONTRACT

The undersigned parties do further agree that the plaintiffs will be additionally represented by P. Rodney Jackson, Attorney At Law, in addition to Harold Albertson, Attorney At Law. This addendum to the contingent fee contract does not change any of the other provisions of the contingent fee contract.

81.    Upon information and belief, Mr. Jackson's clients were not advised by Mr. Jackson or Mr. Albertson that Mr. Jackson was acquiring an interest in the client's cause of action or the subject matter of the litigation through a series of loans made by Mr. Jackson to Mr. Albertson, who was also serving as the client's counsel.

82.    This created a conflict of interest between Mr. Jackson and his clients under R. Prof. Cond. 1.8(j) because Mr. Jackson had a significant proprietary interest in the outcome of the litigation that was independent from the clients' and substantially different than the pecuniary interest a similarly-situated contingency fee attorney would have had who had not invested nearly $500,000 of his own money in undisclosed loans to his co-counsel.

83.    Moreover, most of the $500,000 loaned by LAC and/or Mr. Jackson to Mr. Albertson was unrelated to the litigation as the recapitulation prepared upon information and belief by LAC and/or Mr. Jackson deducted reimbursed expenses of $50,000 and unreimbursed expenses of $36,000 from the contingency fee calculation.

84.     Upon information and belief, LAC, Mr. Jackson, and/or other similar entities owned and/or controlled by Mr. Jackson have advanced loans to clients of law firms to whom LAC, Mr. Jackson, and/or similar entities owned and/or controlled by Mr. Jackson have acquired a proprietary interest in their causes of action or the subject matter of their cases in litigation.

85.     Upon information and belief, LAC, Mr. Jackson, and/or other similar entities owned and/or controlled by Mr. Jackson have marketed themselves to attorneys like Mr. Albertson stating, "Your client receiving an advance of money on their lawsuit from LAC, may help them pay their bills and maintain their lifestyle while they are awaiting settlement or trial."

86.     Upon information and belief, the $50,000 in reimbursed expenses and/or the $36,000 in unreimbursed expenses referenced in the recapitulation prepared upon information and belief by LAC and/or Mr Jackson may have been loans and/or the payment of money by LAC and/or Mr. Jackson to Mr. Albertson's client and/or their family members.

87.     The prohibition against a lawyer acquiring a proprietary interest in his or her client's action is "designed to avoid giving the lawyer too great an interest in the representation," ABA Comment 16 to Model Rule 1.8, because a lawyer's economic interest in the outcome of the client's case can erode the lawyer's independent judgment.

88.     Upon information and belief, Mr. Jackson occasionally though sporadically used LAC as a conduit for loans to Mr. Albertson in an effort to avoid application of R. Prof. Cond. 1.8(j).

WHEREFORE, Plaintiff, Arthur M. Standish, as trustee, demands judgment against Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, in the amount of any fees and/or

expense reimbursement received by Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, determined to be in violation of R. Prof. Cond. 1.8(j).

<u>Count III – Preferential Transfer</u>

89.    Plaintiff incorporates the allegations in Paragraphs 1 through 87 by reference.

90.    11 U.S.C. § 547(b) provides, "Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property— (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made — (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if — (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

91.    According to the recapitulation of respective attorney fees prepared upon information and belief by LAC and/or Mr. Jackson, Mr. Albertson's share of the contingency fee was $1,190,333.

92.    Of this amount, $775,500 was effectively paid by Mr. Albertson to LAC and/or Mr. Jackson, within 90 days before the filing of Mr. Albertson's Chapter 7 Petition that enabled LAC and/or Mr. Jackson to receive, as creditor(s), more than they would have received in a Chapter 7 bankruptcy had the transfer not been made.

93.    As co-counsel with Mr. Jackson for their clients, Mr. Albertson had as much lawful dominion and control over the settlement proceeds as did Mr. Jackson.

94.    Under West Virginia law, Mr. Jackson had a charging lien against the settlement proceeds vis-à-vis his joint clients with Mr. Jackson.

95.    Finally, the payment by Mr. Albertson to LAC and/or Mr. Jackson in the amount of $775,500 within 90 days before the filing of Mr. Albertson's Chapter 7 Petition that enabled LAC and/or Mr. Jackson to receive, as creditor(s), more than they would have received in a Chapter 7 bankruptcy had the transfer not been made was not made in the ordinary course of business.

WHEREFORE, Plaintiff, Arthur M. Standish, as trustee, demands judgment against Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, in the amount of any payments received by Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, determined to be in violation of 11 U.S.C. § 547(b).

ARTHUR M. STANDISH as Trustee

By Counsel

_____/s/ Ancil G. Ramey_____
Ancil G. Ramey
WV Bar No. 3013
Steptoe & Johnson PLLC
P.O. Box 2195
Huntington, WV 25722-2195
Telephone (304) 526-8133
ancil.ramey@steptoe-johnson.com

Sarah McCarty Ellis
WV Bar No. 10434
Steptoe & Johnson PLLC
P.O. Box 1588
Charleston, WV 25326-1588
Telephone (304) 353-8127
sarah.ellis@steptoe-johnson.com