**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | |
|---|---|
| IN RE: <br><br> HAROLD S. ALBERTSON, JR., <br><br> Debtor. <br><br> ARTHUR M. STANDISH as Trustee, <br><br> Plaintiff, <br><br> v. <br><br> P. RODNEY JACKSON and <br> LAC, LLC, a West Virginia limited liability company and <br> LAC HOLDINGS, LLC, <br> a South Carolina limited liability company, <br><br> Defendants. | CASE NO. 13-20455 <br><br> CHAPTER 7 <br><br><br><br> A.P. No.: 2:15-ap-02008 <br><br><br> JUDGE FRANK W. VOLK |

## **MEMORANDUM OPINION AND ORDER**

Pending is the motion to dismiss filed by Defendants P. Rodney Jackson, LAC, LLC ("LAC"), and LAC Holdings, LLC ("LAC Holdings") [Dckt. 11].

It is **ORDERED** that the motion to dismiss be, and hereby is, **GRANTED** as to Count Two and **DENIED** as to its residue.

**I.**

The factual allegations that follow are taken from the operative pleading and treated as entirely accurate for purposes of the motion to dismiss.

On November 6, 2011, Lydia P., a 23-month-old toddler, was tragically injured when a tombstone fell on her. She suffered catastrophic injuries. Lydia P.'s mother retained Debtor

Harold S. Albertson, Jr., by execution of a "Contingent Fee Contract." The Contingent Fee Contract provided pertinently that "The undersigned parties hereby agree that Harold Albertson, Attorney At Law . . . is retained to . . . for a contingent fee of 40% of any recovery." (Compl. ¶ 7). At some unspecified point, Mr. Jackson joined with Mr. Albertson in representing the toddler. On July 21, 2012, Mr. Albertson and Mr. Jackson instituted a civil action in the Circuit Court of Wyoming County. On September 17, 2012, a notice of dismissal was executed, apparently to facilitate settlement.

Mr. Jackson, a West Virginia lawyer, is the sole owner and manager of LAC, a West Virginia limited liability company. On February 15, 2013, LAC merged into LAC Holdings, a South Carolina limited liability company. Following his retention by the toddler's mother, Mr. Albertson and LAC entered into certain written agreements. They appear designed to advance money to Mr. Albertson related to the expected fee from the toddler's case. Mr. Albertson was identified as "Seller" with LAC described as the "Buyer." (Compl. ¶ 14).

For example, the agreement dated February 27, 2013, obliged Mr. Albertson to convey "to LAC a $83,000 interest . . . in the Proceeds" which is defined in the agreement as "The amount of the contingent fee payable to Seller under" a "contingency fee agreement" between Mr. Albertson and his clients in the case involving the toddler. (*Id.* ¶ 16). Mr. Albertson agreed to pay "Interest/Amount Due" to LAC on a prescribed contingent schedule. The February 27, 2013, agreement, via a "DISCLOSURE TABLE" set the applicable "Interest/Amount Due" depending upon whether the sum was paid within 12 ($182,600), 24 ($401,720) or 36 ($883,784) months. If Mr. Albertson failed to recover his contingent fee, the agreement provided that he was not required to pay LAC anything, unless the failed recovery arose out of fraud, misrepresentation, or the like. The agreement additionally provided that:

2

> Mr. Jackson would play no role in the decision with respect to prosecuting the litigation or settlement.
>
> The purchase price would be used by Mr. Albertson for "immediate economic necessities . . ."
>
> The large "profit" potentially applicable under the agreement was due to the "high risk" in "purchasing" a portion of the proceeds of the claim.
>
> Mr. Albertson was advised to seek the services of a tax, accounting or financial advisor.
>
> The proceeds from the claim would first be used to satisfy the obligation owed to LAC with Mr. Jackson "handl[ing] and disburs[ing] all monies received from such claim."

(*Id*. ¶ 19-22). Although the agreement references the payment of "interest" on the $83,000 paid by LAC to Mr. Albertson, it further provides as follows:

> Seller agrees to treat and report the sale and purchase of the Purchased Interest as a sale transaction and not as a loan for all purposes (including tax purposes).

(*Id*. ¶ 23). Paragraph 24 prescribes what will occur in the event Mr. Albertson becomes the subject of a bankruptcy, insolvency or similar proceeding:

> If Seller . . . has commenced against it any case . . . pursuant to any bankruptcy . . . prior to payment of the full LAC, LLC interest/payment to Buyer, Seller shall cause the Purchased Interest to be described as an asset of Purchaser (and not a debt obligation of Seller) in any oral or written communications, including, without limitation, any schedule or other document filed in connection with such case . . . .

(*Id*. ¶ 24). The agreement specifies in its "Reclassification" provision that it is "an investment by Buyer, and not a loan to Seller." (*Id*. ¶ 25). If a court re-characterized the obligation, however, Mr. Albertson promised that interest would accrue at the maximum lawful rate. In that event, expenses such as attorney fees and costs expended by Mr. Jackson in enforcing his rights under the agreement would be characterized as "reimbursements" to Mr. Jackson. (*Id*.).

3

Attached to the above agreement was "Exhibit 'A'" the effect of which was to reflect prior loans and terms for LAC advances to Mr. Albertson. Exhibit A additionally provided as follows:

> Pursuant to that certain Purchase Agreement February 27, 2013 . . . I, Harold Albertson hereby authorize and direct P. Rodney Jackson, co-counsel in the Lydia P . . . case, to . . . pay all sums of money from the Proceeds due and owing by Seller to P. Rodney Jackson, individually, as evidenced by prior written agreements between Seller and P. Rodney Jackson. Such sums shall include evidences by P. Rodney Jackson to Howard [sic] Albertson of $233,000, which shall be paid back without interest. The remaining sums shall be paid back in accordance with the following Exhibits C-F.

(*Id*. ¶ 40). The parties' course of dealing was repeated in similar fashion with other agreements coming later in time. LAC loaned Mr. Albertson $83,000, $4,000, $10,500, $100,000, $35,000, and $15,000, for a total of $247,500.00.

On March 8, 2013, a letter was sent from Johnnie E. Brown, an attorney with the firm of Pullin, Fowler, Flanagan, Brown & Poe, PLLC, to Mr. Jackson. The letter was apparently in relation to the dismissed litigation relating to the toddler and stated as follows: "I wish to further confirm that we have resolved this case for the sum of $7.25 million dollars." (*Id*.).

On May 3, 2013, Mr. Albertson petitioned for approval of the infant settlement in the Circuit Court of Kanawha County. He sought, *inter alia*, "Payment of $2,850,000 to the attorney for petitioner as attorney fees" and the "Payment of $50,000.00 to attorney for petitioner as reimbursement for expenses incurred in pursuing this claim." (*Id*. ¶ 45). On July 1, 2013, an order was entered approving the settlement, with a proportionate fee of approximately one-third rather than forty percent.

Mr. Jackson later offered the following record of distribution to Mr. Albertson:



The Trustee asserts that Mr. Jackson provided Mr. Albertson with the following recapitulation of principal and interest calculations for the amounts "loaned":

$2,466,666

- $50,000.   Reimbursed Expenses
----------------
$2,416,666.

- 36,000.   Non-Reimbursed Expenses
----------------

$2,380,666

$1,190,333.   1/2 of fee to you

- $775,500.   Monies owed by you per agreement
----------------

$414,833.   Net amount of your check. Please see enclosed details
of amounts and dates of cash advances to you.

5

On September 5, 2013, Amity Real Estate, Ltd., Arman Ray Lewis, and Harold Ray Moles, Jr., petitioned for involuntary relief under Chapter 7 of the Bankruptcy Code against Mr. Albertson. On September 9, 2013, Arthur M. Standish was appointed Trustee. Mr. Albertson did not resist the petition. On November 5, 2013, an Order for Relief was entered.

Inasmuch as judicial approval of the settlement occurred July 1, 2013, Mr. Standish asserts any payment to Mr. Albertson, Mr. Jackson, or LAC from the toddler's litigation would have been within the 90-day look back from the involuntary petition.

Additionally, according to the "Loan Amounts Report," Mr. Standish asserts Mr. Albertson was charged as follows in payment to LAC on or after July 1, 2013:

$4,800 in interest on a $4,000 loan made on October 1, 2012.

$23,100 in interest on a $10,500 loan made on October 31, 2012.

$120,000 in interest on a $100,000 loan made on November 7, 2012.

$32,000 in interest on $35,000 in loans made on November 2, 2012, and December 18, 2012.

$99,600 in interest on an $83,000 loan made on February 27, 2013.

$279,000 in interest on payments of $496,500 between October 1, 2013, and May 17, 2013.

Mr. Standish contends the applicable interest rates on these repayments would have exceeded 100% in each instance. Mr. Standish pleads three claims against defendants: (1) usury in violation of West Virginia law inasmuch as the monies paid to Mr. Albertson were "loans with interest provisions in excess of that permitted by law . . . ." (*Id.* ¶ 71) (Count One); (2) illegality, based upon the defendants' failure to comply with certain provisions of the West Virginia Rules

6

of Professional Conduct (Count Two)[1]; and (3) preferential transfers in violation of 11 U.S.C. § 547(b) (Count Three).

In moving to dismiss, Defendants offer four arguments.[2] First, they assert the unambiguous terms of the applicable agreements provide that the monetary transactions were not loans, thus eviscerating both the usury and preferential transfer claims. Second, they assert West Virginia law blocks Mr. Standish from recovering damages under Count Two if that recovery is pegged on violations of the West Virginia Rules of Professional Conduct. Third, assuming the claim alleged under Count Two was viable under West Virginia law, Mr. Albertson's putative violation of the same ethical proscriptions would result in both unclean hands and a defense of *in pari delicto*. Finally, Defendants assert that the usury claim falls short of the plausibility standard of Rule 12(b)(6) as set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and its progeny.[3]

---

[1] In his response to the motion to dismiss, Mr. Standish refers to this claim as one for "Recission." Neither the word "rescission" nor "rescind" appears in the complaint. The word "void" or any variant thereof is also absent from Count Two. At this stage of the litigation, pleading amendments are accomplished, if at all, by motion.

[2] Defendants have moved in the alternative for a more definite statement. A more definite statement is available only if the operative pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The complaint does not suffer from that infirmity.

[3] The very brief, final contention warrants only a summary disposition. In view of the discussion that follows -- and with Mr. Standish benefiting from the presumed veracity of the allegations of the complaint and all reasonable inferences flowing therefrom -- a plausible usury claim is stated. The same is true for the preference claim.

## II.

A.     **Governing Standard**

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *overruled on other grounds*, *Twombly*, 550 U.S. at 562-63); *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions . . . ." *Twombly*, 550 U.S. at 558. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *McCleary-Evans*, 780 F.3d at 585; *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008).

The complaint need not "forecast evidence sufficient to prove the elements of [a] claim," but it must "allege sufficient facts to establish those elements." *Wright v. N. Carolina*, 787 F.3d 256, 270 (4th Cir. 2015); *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (internal quotation marks and citation omitted). Stated another way, the operative pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting the opening pleading "does not require 'detailed factual allegations,' but it demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation."). In sum, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly* 550 U.S. at 570.

The decision in *Iqbal* provides some additional markers concerning the plausibility requirement:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief. . . .'"
>
> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief."
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 678-79 (citations omitted).

As noted in *Iqbal*, the Supreme Court has consistently interpreted the Rule 12(b)(6) standard to require a court to "'accept as true all of the factual allegations contained in the complaint . . . .'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555); *see also South Carolina Dept. of Health and Environmental Control v. Commerce and Industry Ins. Co.*, 372 F.3d 245, 255 (4th Cir. 2004) (quoting *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002)). The court is additionally required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor . . . ." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

B.  Analysis

### 1. The Monetary Transactions Were Not Loans and Thus Incapable of Supporting a Usury or Preference Claim

Defendants assert that the unambiguous terms of the applicable agreements provide that the monetary transactions at issue were not loans. If accurate, the usury and preference claims would evanesce.

In Syllabus Point 1 of *Carper v. Kanawha Banking & Trust Co.*, 157 W. Va. 477, 207 S.E.2d 897 (1974), Justice Haden observed, "Usury is the exaction of a greater sum for the use of money than the highest rate of interest allowed by law." *Id.*, 207 S.E.2d at 901. Justice Haden additionally observed as follows:

> In both historical and contemporary usury statutes, one of the essential elements which must appear from a transaction said to be usurious is a loan or forbearance of money. The generally accepted technical definitions, which distinguish between a loan and a forbearance, are to be found in 45 Am.Jur.2d, Interest and Usury § 117 (1969): 'A 'loan' is an advancement of money or other personal property under a contract or stipulation, express or implied, whereby the person to whom the advancement is made binds himself to repay it at some future time, together with such other sum as may be agreed upon for the use of the money or thing advanced.'

*Carper*, 157 W. Va. at 492-93, 207 S.E.2d at 908 (quoted authority omitted).

Defendants contend that any substantial contingency on repayment, such as litigation success in the toddler's case, would necessarily doom any argument that the transaction was a loan. *See Brakeley v. Tuttle*, 3 W. Va. 86, 133 (1868) ("A contingency merely nominal attended with little or no hazard to the principal of the money loaned or advanced, cannot alter the legal effect of the transaction; and the risk of loss by the death or insolvency of the borrower is not such a contingency or hazard as will take the case out of the operation of the statute."). They additionally point to various portions of the February 2013 agreement -- the only one they contend

is conceivably capable of being characterized as a loan -- attempting to demonstrate that a loan was unambiguously *not* intended by the parties. They add that, in light of the clarity of the language used in the documents, any resort to the extrinsic is improper.

The complaint alleges, in the light most favorable to Mr. Standish and with all attendant reasonable and favorable inferences, as follows:

> LAC, Mr. Jackson or both contracted with Mr. Albertson to receive interest on a loan at a rate exceeding eight percent a year;
>
> The written agreements mischaracterize the transactions as not being in the nature of loans when, in fact, the parties treated them as such. An indication of which is Mr. Jackson's notations describing (1) the transactions as "loans," (2) the process as one of "loaning" money, (3) the amounts as "Monies owed by you per agreement," and (4) the interest in the recovered legal fees at settlements as "collateral;"
>
> The agreements' referenced contingencies were meaningless inasmuch as the toddler's injuries were catastrophic, liability was clear, and the enforceability of any judgment sufficiently certain;
>
> The DISCLOSURE TABLES referencing certain monetary transfers explicitly refer to the "Amount of LAC, LLC's Interest/Amount Due to LAC, LLC."

Defendants challenge these assertions and others. For example, they assert that "[T]he Trustee attempts to distort the term 'interest' [in the DISCLOSURE TABLES] as it is plainly used . . . [therein with the] meaning [of] a stake or share of the contingency fee. . . , taking it out of context to try to make it sound like the parties were referring to 'interest' on a loan." (Reply at 3). That argument may gain ground during discovery. But the DISCLOSURE TABLES alone, at least at the Rule 12(b)(6) stage, suffice to introduce sufficient ambiguity into the written instruments such that extrinsic proof may be considered and the parties' course of conduct used to provide context as to their intentions. In light of that, the Court will not order peremptory dismissal for lack of a loan.

**2. Failure to State a Claim Based on the West Virginia Rules of Professional Conduct**

After quoting a litany of provisions from the West Virginia Rules of Professional Conduct ("Rules") ostensibly violated by Defendants, the thrust of Mr. Standish's claim in Count Two, entitled "Illegality", is summarized as follows:

> WHEREFORE, Plaintiff, Arthur M. Standish, as trustee, demands judgment against Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, in the amount of any fees and/or expense reimbursement received by Defendants, P. Rodney Jackson; LAC, LLC, a West Virginia limited liability company; and LAC HOLDINGS, LLC, a South Carolina limited liability company, determined to be in violation of R. Prof. Cond. 1.8(j).

(Compl. at 20-21).

The Supreme Court of Appeals has for many years prohibited civil litigants from using the Rules as a predicate, much less a foundation, for a civil recovery. On January 1, 1989, the Rules became effective. The "Scope" section of the Rules remained essentially the same for the next 26 years, until December 31, 2014. The relevant pre- and post-amendment versions of the "Scope" section follows:

> Violation of a Rule should not *itself* give rise to a cause of action *against a lawyer* nor should it create any presumption *in such a case* that a legal duty has been breached. *In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation.* The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. ~~Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.~~ *Nevertheless, since the Rules do establish standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct.*

Supreme Court of Appeals of W. Va, *West Virginia Rules of Professional Conduct -- Final Strikethrough Version* 5 (2014) (emphasis in original). The Supreme Court of Appeals recently noted that this provision constitutes a "cautionary admonition regarding the use of the Rules of Professional Conduct in civil actions" and further observed as follows:

> In the scope section of the Rules of Professional Conduct in effect at the time of the actions at issue, it is provided that the "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." The Rules further state that "[t]hey are not designed to be a basis for civil liability." W.Va. R. Prof'l Conduct, scope.

*Rich v. Simoni*, 235 W. Va. 142, 149, 772 S.E.2d 327, 334 (2015); *see also First Nat'l Bank in Marlinton v. Blackhurst*, 176 W. Va. 472, 478, 345 S.E.2d 567, 574 (1986) ("[T]he usual remedy for a violation of the West Virginia Code of Professional Responsibility is a disciplinary proceeding against the attorney"); *In re Palumbo Family Ltd. Partnership*, 182 B.R. 447, 468 (Bankr. E.D. Va. 1995) (attorney's violation of Virginia Code of Professional Responsibility does not produce a private right of action).

Based upon the course of conduct outlined in the complaint, the version of the "Scope" section in effect from 1989 through 2014 applies. Consequently, the alleged Rule violations will not give rise to a cause of action for damages. Dismissal of Count Two is thus required.[4]

### III.

Based upon the foregoing discussion, it is **ORDERED** that the motion to dismiss be, and hereby is, **GRANTED** as to Count Two and **DENIED** as to its residue.

---

[4] This disposition obviates the need to consider the Defendants' unclean hands and *in pari delicto* contentions.

The Clerk shall transmit a copy of this written opinion and order to all counsel and parties entitled to notice.

DATED: March 31, 2016

Frank W. Volk
United States Bankruptcy Judge